UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BEVERLY RICHARDSON, et al.,

                    Plaintiffs,

-vs-                                              Case No.   8:03-cv-544-T-31MSS
                                        (also docketed in 8:03-cv-539-T-31MSS)

BOMBARDIER, INC., et al.,

                    Defendants.
_____

# ORDER DENYING PLAINTIFFS'
# MOTION FOR NEW TRIAL

This case[1] was tried to a jury beginning July 13, 2005.  At the conclusion of the trial, two

claims remained – a negligence claim against Bombardier Services Corp. ("BSC") and a strict

products liability claim against Shorts Brothers PLC ("Shorts").[2]  Both claims involved an alleged

defect in the autopilot system on an airplane assembled by BSC and sold by Shorts to the United

States Army.  On August 2, 2005, the jury returned its verdict, finding for Defendants on both

claims.

I.      Background

On March 3, 2001, an Army National Guard transport airplane took off from Hurlburt

Field en route to Oceana Naval Air Station in Virginia.  On board were 18 members of the "Red

_____

[1]This is one of 13 claims which were consolidated for pre-trial proceedings.  Prior to trial, it was decided that the result of this case would determine liability for all 13 cases, with subsequent damages trials as necessary.

[2]At the conclusion of Plaintiffs' case in chief, the Court granted Rockwell Collins' Rule 50 Motion.

Horse" unit of the Virginia Air National Guard and a crew of three: the pilots, Warrant Officers

Duce and Larsen, and the flight engineer, Sergeant Ward.  About one hour into the flight, while the

plane maneuvered around adverse weather conditions, Warrant Officer Larsen left the cockpit and

proceeded to the lavatory in the rear of the airplane.  The airplane was cruising on autopilot at

9,000 feet, with its elevator[3] at the level-flight equilibrium point of approximately -6°.  About 50

seconds after Larsen left the cockpit, the airplane encountered a wind shear that caused it to pitch

upward and gain altitude.  In response to that movement, the autopilot  lowered the elevator's

deflection angle to lower the airplane's nose.   However, instead of resuming level flight, the

airplane went into a precipitous dive.  Shortly thereafter, the increasing airspeed exceeded the

structural limitations of the airplane, which broke apart and crashed.  All 21 people aboard were

killed.

What caused the airplane to suddenly depart from controlled flight is the critical issue in

this case.[4]  The Defendants contend that the mishap was caused by the crew's negligence.  They

say the crew misloaded the airplane, such that its center of gravity ("cg") was aft of the maximum

design limit.  When Warrant Officer Larsen went to the rear of the airplane, the airplane became

further out of balance, such that it became longitudinally unstable.  When the wind shear occurred,

the airplane became uncontrollable, causing the crash.

The Plaintiffs admit that the cg was at least near the aft design limit, but they focus instead

on the elevator's movement during the mishap sequence.  The elevator did not deflect upward

---

[3]The elevator is a hinged horizontal planar surface on the tail that moves up and down to increase and decrease the airplane's pitch and (resulting) altitude in flight.

[4]Weather was a factor, but the parties agree that it was not the cause of the accident.

significantly.[5]  After years of investigation and study by various experts, Plaintiffs developed as the centerpiece of their claim the "binding clip-jamming cable" hypothesis.  Plaintiffs contend, in essence, that a defect in the installation of the autopilot system prevented the pilot from controlling the elevator.

### A.      The Airplane and the Autopilot System

The airplane involved was a "Sherpa" C-23B+ that the United States, via a U.S. Army contract, purchased in 1993 from Shorts.[6]  The airplane was modified by the predecessor of Defendant BSC.  The U.S. Army contract required Shorts to deliver the airplane with an integrated autopilot system (APS-65) manufactured by Rockwell Collins.  At the time of the accident, the airplane had operated more than 1,300 hours.  No problems had been noted with operation of the autopilot system.

The following images give a rough idea of the autopilot system's orientation and location, on the centerline of the ceiling, above and aft of the "U.S. ARMY" tag on this exemplar C-23B+.[7]

_____

[5]Presumably, the pilot would have been "in the loop" (*i.e.*, grasping the yoke) shortly after the plane pitched upward.  In order to bring the nose back up after it passed through horizontal flight, the pilot would have been expected to pull back on the yoke, which would raise the elevator.  However, the flight data recorder (FDR) shows only a 2.6° positive deflection.

[6]Shorts is a wholly-owned subsidiary of Bombardier, Inc.  The airplane involved in this case was produced in 1997 and accepted by the Army in January 1998.

[7]Plaintiff's Exhibit 28 (Figure 1, hereto) is a more accurate schematic of the autopilot system.  Plaintiff's Exhibit 3 (Figure 2, hereto) is a larger photograph of a C-23B+ exemplar aircraft.

 

The pilot controls the elevator via a series of rods connected to the yoke in the cockpit.  The autopilot system is integrated into the elevator control-rod assembly.  The autopilot system is comprised of a stainless steel elevator cable running in a circuit from the capstan/elevator servo unit to the elevator control quadrant.  The elevator servo is a motorized mount at the base of the capstan.  A segment of the elevator cable is channeled into a corkscrew-oriented groove along the cylindrical surface of the capstan, which is about four inches in diameter.  When the autopilot is engaged, the capstan rotates clockwise and counter-clockwise to control the elevator's deflection angle.  Four guard posts surround the capstan to provide rigidity to the capstan/elevator servo unit and to prevent the elevator cable from slipping out of the capstan's groove.  To keep the cable in the capstan groove, the gap between the outer edge of the capstan's groove and the guard posts was set at one-half the diameter of the elevator cable.  The figure on the left, below, is a side view of a capstan/elevator servo unit (as oriented in the autopilot system schematic, above), and the figure on the right, below, is an overhead view of the same:

 

For identification purposes, the parties color-coded the capstan guard posts.

The elevator cable is secured at the cap-end of the capstan's cylindrical surface by a stainless steel clip[8] that is fastened to the capstan with a screw and a lock washer and then safety-wired. The stacking order is supposed to be capstan-clip-washer-screw. In the subject airplane, however, the stacking order was capstan-washer-clip-screw. This had the effect of raising the clip above the capstan by the width of the washer.

### B.    The Binding Clip-Jamming Cable Hypothesis

There was no evidence in the wreckage indicating that the elevator control-rod system failed. Plaintiffs' focus, therefore, turned to the autopilot system. To account for the steep dive, the Plaintiffs needed to find something that would cause the elevator to stop at a deflection angle

---

[8]This clip is less than ½ inch long, ¼ inch wide and thinner than a standard playing card. The figure on the right, above, shows the clip partially obscured by the white post, about half its actual size, and without the safety wire.

of about -3.4°.  The Plaintiffs determined that the elevator could be held at that angle if the

capstan's rotation was arrested with the capstan clip about five inches (measured along the cable)

from the white post.  Nevertheless, even if one assumed that the elevator cable had jammed at that

so-called "five-inch position," Plaintiffs had to explain two things: how, despite the jam, the

elevator managed to move across a range of about 3° during the mishap sequence (from -6° to -3°)

and why, after the crash, the elevator cable was found jammed at the so-called "10-inch position" –

*i.e.*, with the capstan clip about 10 spooled inches from the white post.

To explain the mishap sequence, Plaintiffs isolated two alleged faults in the capstan.

According to the Plaintiffs, the capstan-washer-clip-screw stacking arrangement permitted the clip

to contact the yellow guard post as the capstan rotated in normal operation,[9] and a worn bushing

allowed the capstan to wobble on its axis.  From this starting point, Plaintiffs formulated the

following hypothesis:  At the beginning of the mishap sequence, the elevator's deflection angle

was near -6°, which put the clip in the vicinity of the yellow post.  When the pilot pulled on the

yoke to raise the airplane's nose, the clip contacted the yellow post with sufficient force to cause a

firm bind.[10]  This first pull on the yoke stretched the lower elevator cable and caused the capstan to

wobble away from the white post, which in turn caused the upper cable to become slack.  As a

result, and with the airplane 30° nose down and approaching zero Gs, the upper elevator cable

floated out of its groove, moved sideways, and became jammed at the 5-inch position between the

---

[9]When the autopilot is off and the pilot is in control, the capstan simply rotates freely as the
elevator rods move.

[10]Plaintiffs offered no explanation as to how the clip could pass by the yellow post throughout
its 1300-hour history of operation and then suddenly bind with enough resistance to interfere with the
elevator control.

capstan and the white post.  This jam prevented the capstan from turning and, in turn, prevented the pilot from manually deflecting the elevator to resume level flight.

To account for the elevator's approximate 3° movement during the mishap sequence, Plaintiffs contend that the pilot's initial pull on the yoke was sufficient to stretch the lower elevator cable and move the elevator by that amount.[11]  Finally, because the cable was not jammed at that 5-inch position after the crash, Plaintiffs hypothesized that, in the final seconds of the mishap sequence, the pilot was somehow able to clear the jam with a second pull on the yoke, while the airplane was at 60° nose down, with an airspeed of 224 knots, and at negative Gs.[12]  At that point, however, it was too late; the airplane had exceeded its structural limits and was breaking apart.  In the tumult, the elevator cable was thereafter jammed in the 10-inch position.

## II.    Daubert and The Scientific Method

In *Daubert v. Merrill Dow*, 509 U.S. 579 (1993), the Supreme Court admonished trial courts to fulfill a gatekeeping role in the presentation of expert testimony.  That role took on heightened importance in this case, because Plaintiffs' entire case was built upon "expert testimony."

Federal Rule of Evidence 702 ("Rule 702") provides that:

---

[11]The yoke has a mechanical advantage over the autopilot system.  One pound of force on the yoke exerts 3.6 pounds of force over the elevator cable.  If a jam were present in the autopilot system, the elevator control quadrant would transmit force, if any, from the yoke to the elevator cable.

[12]Plaintiffs made no effort to explain how the pilot could have dislodged a jam on the second pull after failing on the first pull, which would have presented a significantly better opportunity. During the second pull, the pilot was experiencing negative Gs, giving him less leverage to pull on the yoke.  And, in the time between the pulls, an increase in the air pressure on the elevator, due to increased airspeed, would have required greater force on the yoke to obtain the same elevator deflection.

> If scientific . . . knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

From the reference to "scientific knowledge" and the condition that it "will assist the trier of fact," the Supreme Court, in *Daubert*, interpreted Rule 702 to require that expert testimony on scientific matters have the following inter-connected attributes:

•   that it be "scientific," having a "grounding in the methods and procedures of science";

•   that it bear the hallmarks of "knowledge," which "connotes more than subjective belief or unsupported speculation"; and

•   that it "assist the trier of fact" or "fit" a matter at issue, meaning that it expresses scientific knowledge as to the proposition for which it is offered.

*Daubert*, 509 U.S. 579, 592 (1993).  Expert testimony need not purport to reveal a known certainty, but it must be derived by the "scientific method," which requires that it be supported by appropriate validation based on what is known.  *Id.*

As explained in *Daubert* and subsequent case law, courts have a gatekeeping function under Rule 702 to determine whether an assertion, which purports to be scientific, is sufficiently reliable that it may form a sound basis for knowledge of a relevant historical fact.  Courts are to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  *Id.* at 592-93.  Evidentiary reliability is the focus of this inquiry.

"The proponent of the expert testimony carries a substantial burden under Rule 702. The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." *Cook v. Sheriff of Monroe County, Florida*, 402 F.3d 1092, 1107 (11th Cir. 2005) (internal citation and quotation omitted).  In assessing whether this burden has been met and proffered "scientific" testimony is sufficiently reliable, a court should rigorously consider the following factors, among perhaps others: (1) whether the testimony can be or has been verified by the scientific method through testing; (2) whether the underpinnings of the testimony have been subject to peer review; (3) the known or potential rate of error in the witness's technique(s); and (4), if the circumstances might allow for it, whether the substance of the testimony has gained acceptance in the relevant scientific community.  *See Daubert*, 509 U.S. at 593-94; *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005), *cert. den.,* 126 S.Ct. 419 (2005).

In sum, *Daubert* indicates that to obtain scientific knowledge, the proper epistemological approach is empiricism, *i.e.,* testing or experimental validation.  In other words, a hypothesis (such as Plaintiffs' binding clip-jamming cable hypothesis) ceases to be mere speculation only when it is elevated to the status of a theory through analysis of its falsifiability, refutability or testability.  As noted by the Supreme Court, "Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." *Daubert*, 509 U.S. at 594.

### III.     The Scientific Method – Questions and Answers

Plaintiffs' theory rests upon the following assumptions:

(1)     The retaining clip was mis-assembled, thus

(2)     causing the clip to bind on the yellow guard post, causing

(3)     the lower cable to stretch, while the capstan torqued and the posts wobbled

sufficiently to

(4)     cause the upper cable to float out of the capstan groove and

(5)     move sideways, thus

(6)     jamming between the capstan and the white guard post with sufficient resistence to

prevent the pilot with a 3.6:1 mechanical advantage from pulling the jam free.

From a scientific standpoint, these assumptions suggest numerous questions, susceptible to

scientific analysis or testing.  For example:

(1)  Has this problem occurred before or since?; (2) Using an exemplar, is it possible to

actually bind the clip on a guard post?  (3)  If a clip does bind, what force would be required to

pull it past the post?  (4) What force was required to produce the deflection and distortion

observed in the subject clip after it was removed from the wreckage?  (5) What force was required

to produce the metallurgical evidence of contact between the clip and the post?  (6) What amount

of capstan torquing and cable stretching would be necessary for the cable to float out of its groove

at zero Gs?  (7) How much force would need to be applied to the cable (and yoke) to stretch the

cable enough to do this?  (8) What would cause the slack cable to move sideways and jam between

the capstan and the white guard post?  (9) If a cable does jam between the capstan and guard post,

how much force does it take to pull it free?  (10) How much force does it take to stretch the servo

cable enough to deflect the elevator approximately 3° with a jammed capstan?  (11) Can Plaintiffs'

failure scenario be duplicated by a controlled test using whatever physical variables are

appropriate?  (12) What amount of force would cause the kink and cable distortion observed at the

5-inch point?  (13) Is there any evidence that the contact between the clip and the guard post

occurred at the time of this incident?  (14) Could any of Plaintiffs' observations be explained by

the fact that the airplane impacted the ground at a force of 200 Gs?  Unfortunately, few of these

questions were even addressed, much less answered, by the Plaintiffs.

At trial the Plaintiffs called upon their accident reconstructionist, Mr. Bowman, to explain

their theory.[13]  He discussed the testing done on an exemplar airplane with Mr. Schaefer, their test

pilot expert, and relied upon the materials analysis conducted by Dr. McSwain, their metallurgist.

But Mr. Bowman admitted that Plaintiffs conducted no other testing of their theory, and he was

unable to answer virtually all of the preceding questions.[14]

As an excuse, Mr. Bowman says that it would be impossible to replicate in a static test the

dynamics affecting the airplane during flight.[15]  This excuse, however, rings hollow.  The only

factors which he mentions that might skew the results are the weightless G-force and the natural

flexing of the airframe.  A weightless cable is a known fact, i.e., zero Gs.  It can easily be

replicated.  While precise measurement of airframe flex may not be possible, this is merely a factor

---

[13]Although Plaintiffs employed numerous experts, they used Mr. Bowman to explain the theory.  Mr. Bowman, in turn, relied on data and opinions of other experts to support his failure analysis.

[14]Interestingly, Dr. McSwain, who did do some scientific testing and materials analysis, recommended that additional testing be done to address these questions.  His suggestion, however, was rejected by the other experts on Plaintiffs' team.  Moreover, Dr. McSwain himself did not address the forces which would be required to produce the results he observed.

[15]Responding to questions about his lack of testing, Mr. Bowman repeatedly characterized his efforts as an "analysis."  The analysis of data, however, is a step in the process of formulating a hypothesis.  It is not a substitute for testing the hypothesis itself.

which needs to be taken into account.[16]  The uncertainty of one contributing factor is not a basis for discarding entirely the pursuit of testing consistent with the scientific method.

Plaintiffs rely on the testimony of Dr. Robert McSwain as support for their compliance with the scientific method.  Dr. McSwain is a recognized expert in materials analysis with a state-of-the-art laboratory in Pensacola, Florida.  He examined the subject servo mount using various microscopic techniques.  He also cut the capstan in half to observe its construction.  He discovered a worn bronze bushing which he claims made the capstan loose.  However, he did not quantify the amount of wear or the effect this wear would have on movement of the capstan.  He also observed material transfer between the clip and the yellow post, deformation of the clip's edge, microscopic marks on the guard posts and material transfer from the cable to the capstan.  Plaintiffs point to these observations as evidence of the clip bind.  While these observations may constitute evidence of some contact between the clip and the yellow post and between the cable and the capstan at the white post, the question remains, when did the contact occur and how much resistance did it create?[17]  These questions were never addressed by Plaintiffs.[18]

_____

[16]An exemplar of the servo capstan section of a 23B+ airframe was displayed at trial.  The Court's lay observation of this section suggests that significant flexing would not occur.  In any event, Plaintiffs made no effort to quantify the flexing that could occur, nor its effect on the servo capstan.

[17]If the clip was mis-assembled as Plaintiffs suggest, causing contact with the guard posts, this contact would have occurred continuously throughout the operational life of this airplane.  The friction from such continuous contact would have the effect of reducing over time the binding tendency espoused by Plaintiffs.

[18]Defendants presented substantial evidence suggesting that Plaintiffs' theory defied the laws of physics and that Plaintiffs' hypothesis was not only unproven, but impossible.  In short, Defendants consistently referred to Plaintiffs' case as "junk science."

Although the Court had substantial reservations about the sufficiency of this evidence under Federal Rule of Civil Procedure 50 ("Rule 50"), the Court allowed the case to go to the jury.[19]  After deliberating approximately six hours, the jury rejected Plaintiffs' claim that the servo mount was negligently or defectively installed, and rendered its verdict for the Defendants.

## IV.    Plaintiffs' Motion for New Trial

Plaintiffs have filed a Motion for New Trial (Doc. 115) with supporting Amended Memorandum (Doc. 133).  Defendants responded (Doc. 129).  The Court heard oral argument on November 9, 2005.

"Generally, motions for a new trial are committed to the discretion of the district court." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984); *see also Harris v. Chanclor*, 537 F.2d 203, 207 (5th Cir. 1976) (noting that this Circuit has long recognized this standard).[20]  However, "the district court's power to grant a new trial motion is limited to those circumstances where a miscarriage of justice would result if the verdict were to stand." *Olefins Trading, Inc. v. Han Yang Chem Corp.*, 9 F.3d 282, 289 (3rd Cir. 1993) (internal citations and quotations omitted); *see also Shaps v. Provident Life & Acc. Ins. Co.*, 244 F.3d 876, 885 (11th Cir. 2001) ("A new trial may be ordered only when the interests of substantial justice are at stake.") (internal citation and quotation omitted).  The burden of showing the existence of harmful prejudice rests on the moving party.  *Clarksville-Montgomery County Sch. Sys. v. U.S. Gypsum Co.*, 925 F.2d 993, 1002 (6th Cir. 1991); *see also Sargeant v. Serrani*, 866 F. Supp. 657, 662 (D. Conn. 1994) (noting that burden on moving party is "substantial").

-----

[19]The Court reserved ruling on the Motion for Judgment as a Matter of Law as to Shorts and BSC.

[20]All decisions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent on courts within the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

The issue to be determined on a motion for new trial is whether, assuming the matter in question was erroneous, the complaining party actually suffered harm as a result. *See Martin v. Travelers Indem. Co.*, 450 F.2d 542, 556 (5th Cir. 1971). Indeed, Federal Rule of Civil Procedure 61 ("Harmless Error") specifically provides:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict . . . unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Fed.R.Civ.P. 61. *See Peat, Inc. v. Vanguard Research, Inc.* 378 F.3d 1154, 1162 (11th Cir. 2004) ("Our cases, consistent with Rule 61 of the Federal Rules of Civil Procedure, hold that a new trial is warranted only where the error has caused substantial prejudice to the affected party").[21] Whether a party has been substantially (or unfairly) prejudiced depends on the particular circumstances of the case. *Univ. City v. Home Fire & Marine Ins. Co.*, 114 F.2d 288, 295 (8th Cir. 1940). A court may grant a motion for new trial in a variety of circumstances, including: when the verdict is against the clear weight of the evidence; when the court determines the trial was not fair; or "upon a showing of certain substantial errors in the admission of evidence or the giving or

---

[21] *See also Nicholas v. Homelite Corp., A Div. of Textron, Inc.*, 780 F.2d 1150, 1155 (5th Cir. 1986) (moving party must demonstrate "unfair prejudice"); *Sargeant*, 866 F. Supp. at 662 ("While a new trial may be granted if there was substantial error in the admission or exclusion of evidence or if the Court committed error in its jury instructions, the Court may not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.") (internal citations and quotations omitted).

refusal of instructions."[22]  *Hall v. Norfolk S. Ry. Co.*, 829 F. Supp. 1571, 1579 (N.D. Ga. 1993) (internal citations omitted).

The Court may not grant a new trial based on alleged errors committed during trial when the moving party failed to make timely objections to those errors during trial; in other words, the moving party may not raise objections to alleged errors for the first time in a motion for new trial. *See Nissho-Iwai Co., Ltd. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 619 (5th Cir. 1988). When contemporaneous objections were not raised, the reviewing court examines the issues in question for plain error.  *Shaps*, 244 F.3d at 885; *Brough v. Imperial Sterling, Ltd.*, 297 F.3d 1172, 1179 (11th Cir. 2002).[23]

## V.    Discussion

Plaintiffs' motion is instructive not only in what it says, but what it does not.  It barely mentions the substance of Plaintiffs' primary theory of liability – the jammed cable hypothesis. Instead, in a remarkable misstatement, Plaintiffs contend that the Court improperly excluded

---

[22]*See Deas v. PACCAR, Inc.*, 775 F.2d 1498, 1504 (11th Cir. 1985):

[T]here is a distinction between a new trial awarded because the verdict was against the weight of the evidence and one awarded for other reasons. . . . New trials granted because (1) a jury verdict is against the weight of the evidence may be sharply distinguished from (2) new trials ordered for other reasons: for example, evidence improperly admitted, prejudicial statements by counsel, an improper charge to the jury or newly discovered evidence.  In the first instance given it is the jury itself which fails properly to perform the functions confided to it by law. . . . In the latter instances . . . the trial court delivered the jury from a possibly erroneous verdict arising from circumstances over which the jury had no control.  Under these conditions, there is no usurpation by the court of the prime function of the jury as the trier of the facts and the trial judge necessarily must be allowed wide discretion in granting or refusing a new trial.

[23] "For there to be plain error, there must (1) be error, (2) that is plain, (3) that affects the substantial rights of the party, and (4) that seriously affects the fairness, integrity, or public reputation of a judicial proceeding." *Brough*, 297 F.3d at 1179.

Plaintiffs' "main theory of liability," *i.e.*, the "failure to match the autopilot system to the C23B+ aircraft."   Plaintiffs also question some of the Court's evidentiary rulings and criticize the Court's conduct of the trial.   These issues will be addressed below.

### A.      Conduct of the Trial

This was a long, complex and emotionally charged trial.   Its complexity was magnified by the fact that virtually the entire case was based on expert testimony, which invoked the Court's gatekeeping responsibility under Rule 702 and *Daubert*.[24]

*(1)      Questions and comments in front of the jury.*

During the course of the trial, the Court asked some questions of the witnesses for both sides.   These questions were not numerous, nor was their content improper.   On every occasion when the Court asked any questions, it gave counsel the opportunity to follow up with any additional questions they thought appropriate in light of the Court's inquiry.   Plaintiffs' counsel <u>never</u> objected during the trial to the Court's limited questioning of some of the witnesses.[25] Indeed, it was the Court's impression that the Court's attempt to clarify the issues was helpful both to the parties and to the jury.[26]

---

[24]This was a Tampa case which the undersigned agreed to try in Orlando as a result of Judge Moody's conflicting trial schedule.  Almost all of the motions in limine had been ruled upon by Judge Moody prior to the reassignment.

[25] Accordingly, the Court's review of these instances is limited to plain error review.  *See* discussion at pages 15-16, *supra*.

[26]The jury also asked some questions.

The Court, in a case such as this, is not simply a referee.   Its duty is to conduct the trial fairly and in accordance with the rules of evidence and procedure.  *Quercia v. U.S.*, 289 U.S. 466, 469 (1933).  In that regard, the Court is not a mere spectator in the truth-seeking function.  *See Simon v. U.S.*, 123 F.2d 80, 83 (4th Cir. 1941) (a federal trial judge "sits to see that justice is done in the cases heard before him; and it is his duty to see that a case on trial is presented in such way as to be understood by the jury, as well as by himself").  Indeed, in a case such as this, the Court would be remiss in not speaking up when confusion reigns.[27]  *See Desjardins v. Van Buren Cmty. Hosp.*, 969 F.2d 1280, 1281 (1st Cir. 1992) ("Active participation by a district judge in trial proceedings . . . is in itself neither improper nor unfair. . . . In addition to his right to clarify the evidence, a judge has the responsibility to oversee the conduct of a trial so that it moves expeditiously.").

District judges are clearly entitled to question witnesses, particularly where necessary to clarify factual issues, when counsel's examination or cross examination was inadequate, or to draw out information from witnesses who are either inarticulate or less than candid.  *Crandell v. U.S.*, 703 F.2d 74, 77-78 (4th Cir. 1983).  *See also Desjardins*, 969 F.2d at 1282 (where judge questioned witness on certain matters because judge felt matters had not been fully developed, such questioning did not demonstrate partiality, and judge charged jury that they were triers of fact

---

[27] *See Quercia*, 289 U.S. at 469:

It is within [the judge's] province, whenever he thinks it necessary, to assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence, by drawing their attention to the parts of it which he thinks important, and he may express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination.

and were not to give special significance to judge's questions); *Garrett v. Desa Indus., Inc.*, 705 F.2d 721, 724 n.1 (4th Cir. 1983) (even where judge participated to "uncommon degree" in questioning of witnesses, it did not amount to denial of fair trial).[28]

Isolated incidents must be considered in light of the entire trial, "to guard against magnification . . . of instances which were of little importance in their setting." *Aggarwal v. Ponce Sch. of Medicine*, 837 F.2d 17, 22 (1st Cir. 1988); *see also Brough*, 297 F.3d at 1181 ("In assessing whether prejudice exists that has affected the parties' substantial rights, a court must consider the record as a whole and not merely isolated remarks.").

---

[28] The cases Plaintiff cites are readily distinguishable from the circumstances of the instant case. *See, e.g., Rivas v. Brattesani*, 94 F.3d 802, 807-808 (2nd Cir. 1996) (court's comments and questions were prejudicial to defense, particularly where, in light of conflicting testimony, judge's use of word "fraud" was "potentially fatal to defendants' case"); *Santa Maria v. Metro-North Commuter R.R.*, 81 F.3d 265, 273-74 (2nd Cir. 1996) (judge's conduct prejudiced plaintiff where judge displayed antipathy to plaintiff's claim that went beyond mere skepticism, judge's remarks and questioning of witness aided defense case, and judge engaged in other conduct that prejudiced plaintiff's case); *Champeau v. Fruehauf Corp.*, 814 F.2d 1271, 1275-76 (8th Cir. 1987) (cumulative effect of court's conduct was prejudicial, where court interfered with party's expert testimony at least 145 times and did so in manner that led expert off on irrelevant tangent and confused or misstated expert's testimony, solicited factual and legal arguments in front of jury, and made numerous improper comments on the evidence, as well as engaging in other prejudicial conduct); *Dartez v. Fibreboard Corp.*, 765 F.2d 456, 471-73 (5th Cir. 1985) (judge's remarks prejudiced defense case where comments could have been interpreted by the jury "as attributing an unwarranted degree of incompetence and obfuscation of issues to defense counsel that could weigh against accepting the defenses offered on behalf of their clients;" judge remarked on defense case in front of jury, indicated that he wanted to silence defense counsel from making foolish objections, indicated that counsel's objections reached a high level of absurdity, compared counsel to a first year law student, and *sua sponte* interrupted examinations with negative comments); *Pollard v. Fennell*, 400 F.2d 421, 425-26 (4th Cir. 1968) (judge exceeded bounds and prejudiced defense where he unnecessarily intervened in interrogation of witnesses, engaged in leading questions in which he disclosed testimony, misstated contents of plaintiff's deposition, failed to act impartially by making his position "crystal clear," and depicted defense counsel as taking unfair advantage when counsel attempted to expose inconsistency in testimony); *Myers v. George*, 271 F.2d 168, 173-74 (8th Cir. 1959) (judge's remarks were prejudicial where he "ridicule[d] and belittle[d] plaintiff's calling and his alleged cause of action and tended to make a mockery out of the trial").

Having reviewed the trial transcript, the Court rejects Plaintiffs' contention.  The Court's questions were limited and pertinent.  They were not phrased in an adversarial manner as suggested by Plaintiffs.  To the extent the questions (and answers thereto) exposed weaknesses in Plaintiffs' case, then so be it.  It is not the Court's duty to shield the jury from an implausible claim.  *See Goldman v. Fenn*, 252 F.2d 48 (1st Cir. 1958) (noting that although court examined plaintiff's expert at length and in seemingly hostile manner, such examination "may perhaps have been justified by the evident weakness of the plaintiff's case").  The fact that the Plaintiffs failed to quote any allegedly improper questions by the Court in their memorandum – instead simply string-citing dozens of references to the transcript (Doc. 133 at 13-14) – reinforces this conclusion.

Plaintiffs also criticize certain comments made by the Court during the trial.  In doing so, Plaintiffs cherry-pick statements out of context (*e.g.,* calling Plaintiffs' mock-up a "contraption")[29] while ignoring the Court's admonition to Defendant to quit calling Plaintiffs' animation a "cartoon."  (*See* T. at 525).  While the level of professionalism displayed by counsel during the trial was generally good, there were exceptions – instances where emotions tended to cloud judgment, and the Court admonished both sides to constrain their conduct accordingly.

Plaintiffs complain about remarks in front of the jury exhibiting impatience with Plaintiffs' lawyers and their examination of witnesses.  The trial judge is allowed to make comments during a trial, including comments on evidence, and "[m]ere active participation by a trial judge does not deprive a party of a fair trial."  *Aggarwal*, 837 F.2d at 22.  "In order to be entitled to a new trial, the [moving party] must demonstrate that the court's comments became so one-sided as to become

---

[29]"Contraption" was an apt (and non-pejorative) description of Plaintiffs' device.

advocacy." *Markovich v. Bell Helicopter Textron, Inc.*, 805 F. Supp. 1231, 1240 (E.D. Pa. 1992).

A judgment may be disturbed only where the court's actions excited such prejudice as to preclude

a fair consideration of the evidence, thereby affecting the substantial rights of the parties involved.

*Brough*, 297 F.3d at 1180-81; *Wilson v. Bicycle S., Inc.*, 915 F.2d 1503, 1508-1509 (11th Cir.

1990).

The presentation of Plaintiffs' case was long, drawn-out and unduly cumulative.[30]  To keep

the trial on track, the Court admonished both sides to avoid wasting time.  Usually, these

discussions would occur outside the presence of the jury.  Inevitably, however, there were

occasions when the Court was required to intervene in the presence of the jury to move the case

along, and Plaintiffs' counsel never objected.  Under the circumstances, the Court believes it

demonstrated remarkable patience in allowing Plaintiffs to present their case, and the Court's

remarks did not reach such a level as to cause any harm to either side, much less undue prejudice

to the Plaintiffs.[31]

---

[30]Plaintiffs' counsel was also quite disorganized, throughout the trial asking for "a moment" in order to find a particular exhibit.  Needless to say, these "momentary" delays became tiresome, but the Court always gave Plaintiffs as much time as they needed to find their evidence.

[31]*See Murphy v. City of Flagler Beach*, 761 F.2d 622, 627 (11th Cir. 1985) (where judge described attorney's request for brief recess as "highly ridiculous," judge was obviously angry and his words ill-chosen, but such an isolated incident did not constitute prejudicial or reversible error); *Desjardins*, 969 F.2d at 1282 (where judge asked counsel not to be repetitive and to follow proper procedure in questioning witness, such comments are routine, were not exceptional, and did not affect substance of evidence introduced at trial); *Westminster Elec. Corp. v. Salem Eng'g & Constr.*, 712 F.2d 720, 722-23 (1st Cir. 1983) (where judge was frequently impatient with counsel and anxious to move case along, and made sharp remarks to counsel, including remarks that breached judicial decorum, although appeals court did not condone judge's conduct, behavior was not so abusive as to render trial unfair, in part because counsel failed to object at time of incident).

(2)      *The appearance of bias outside the jury's presence.*

Perhaps the most egregious and disingenuous example of record distortion is Plaintiffs'

claim that the Court was callous toward the grief portrayed by the families who attended the trial.

Since this claim attacks not only the Court's legal rulings, but its moral fiber, it is necessary to set

the record straight.

At the outset of and throughout the trial, the Court stated its commitment to ensure that the

case was decided on the merits, and not sympathy.  Notwithstanding this admonition, Plaintiffs'

counsel made numerous efforts to improperly invoke the jury's sympathy.[32]  For example, at the

outset, Plaintiffs wanted to instruct the jury that their verdict would decide the liability for all 13

families.  The Court ruled, quite properly, that such was not "evidence" and that, in any event, it

was either not relevant or that any relevance would be outweighed by its prejudicial effect under a

Federal Rule of Evidence 403 ("Rule 403") analysis.[33]

---

[32]One outrageous example occurred during the cross-examination of Shorts's corporate representative, Mr. McCoy.  During direct, Mr. McCoy testified that Shorts had never received any complaints concerning the Army's fleet of Sherpa aircraft.  On cross, Ms. Tarbe asked Mr. McCoy (in a righteously indignant fashion):

> Q.      You said earlier to counsel that there had been no complaints about the B+ airplane, didn't you?
> A.      None that I'm aware of.
> Q.      Are 21 dead men on –
> THE COURT: Wait a minute. Wait a minute. Ms. Tarbe, you know better than that.

(T. at 2343).

[33]The Court was only trying one case – the Richardson case.  The fact that it had been agreed that the outcome of this case would resolve liability for the others is not something that was relevant to this jury's determination.  It was no secret that 21 people died in the crash.

During the testimony of Col. Richardson, Plaintiffs sought to introduce a large photo of the crash scene. Defendants objected, and a bench conference was held. (T. at 2574). Defendants argued relevance and undue prejudice under Rule 403. While the Court was skeptical, Plaintiffs' counsel assured the Court that the photo was being used for a proper purpose. The Court therefore overruled Defendants' objection. Then, as soon as the photo was displayed, many of the widows sitting in the gallery of the courtroom stood and began weeping and sobbing. The Court was concerned, of course, as to the effect this display of emotion would have on the jury, so the Court immediately called a recess (T. at 2580). Outside the presence of the jury, the Court observed, quite logically, that the apparent purpose of displaying the photo was to provoke the outpouring of grief which followed. Plaintiffs' counsel denied any such intent, and the Court accepted counsel's representation of good faith. However, the Court discussed its concerns with Plaintiffs' counsel, and informed them of its obligation to ensure that the case be decided on the merits, not on sympathy. The Court noted that the widows' grief was understandable, and the Court was in no way critical of them. Rather, the Court was concerned with what appeared to be a deliberate attempt by Plaintiffs' counsel to violate the Court's proscription against efforts to unfairly engender sympathy. In any event, the interrogation proceeded without further incident and Plaintiffs were allowed to continue using the photograph.

Finally, Plaintiffs impugn the Court's concern (while driving to work) about the structure of closing argument. (Doc. 133 at 18).[34] The Court became concerned because, the previous day,

---

[34]Yes, the Court thinks about his cases at night, over the weekends, and even "while driving to work." Indeed, while trying this case, the Court worked weekends and did not take a lunch break for three weeks.

Plaintiffs' counsel had sought to reserve an unusually large portion of his argument time for rebuttal.  The Court simply advised Plaintiffs' counsel that rebuttal was for <u>rebuttal</u>, and should not be used to sandwich Defendants' argument in between two closing arguments by Plaintiffs.  Plaintiffs' counsel did not object (indeed there would be no basis to object) and the arguments proceeded without interruption.  There was no indication that Plaintiffs' closing was impeded in any way by this perfectly proper observation.

     *(3)      Evidentiary rulings.*[35]

          *(i)      The Collateral Investigation Board ("CIB") report.*

Prior to trial, Judge Moody heard extensive argument concerning admissibility of the CIB report.  In accordance with 10 U.S.C. § 2254(d), Judge Moody ruled that the CIB's conclusion[36] was inadmissible, but the balance of the report would be admitted, and the parties were ordered to

---

[35] *See U.S. v. 99.66 Acres of Land*, 970 F.2d 651, 658, (9th Cir. 1992) ("A new trial is only warranted on the basis of an incorrect evidentiary ruling if the ruling substantially prejudiced a party."); *Peat*, 278 F.3d at 1162 ("[T]he inquiry is always directed to the same central question – how much of an effect did the improperly admitted or excluded evidence have on the verdict?").

[36] In summary, the CIB found that the crash was caused by the crew's failure to properly load the aircraft:

> In particular, the crew's failure to properly manage the weight and balance of the aircraft resulted in an "out-of-CG" condition that exceeded the aircraft design limits, rendering the aircraft unstable and leading to a violent departure from controlled flight. . . . Once the aircraft departed controlled flight, the rapid onset of significant G-force shifts rendered the crew and passengers incapacitated and unconscious and led to a structural break-up of the aircraft in flight.  This ultimately resulted in the aircraft impacting the ground, killing all on board.

(Doc. 213 in 8:03-cv-539 at 22).

redact the document accordingly.[37]  At trial, an issue arose concerning Sec. 1 of the report.  Sec. 1 contains a memorandum from Major Gen. Harrison, the Adjutant General of the Florida National Guard, which was critical of some of the CIB's factual conclusions.[38]

In his memo, Gen. Harrison determined that the CIB conducted its investigation properly. (Doc. 213 in 8:03-cv-539 at 14).  While he was critical of the board's findings, he accepted the report and its conclusion and recommended, *inter alia*, that all C-23 flight operations adhere to more restrictive takeoff and landing cg limits until additional tests were performed.  (Doc. 213 in 8:03-cv-539 at 19).  Nothing in his memorandum suggests a defect in the autopilot system or its installation as being a cause of the accident.  Indeed, the memo acknowledges crew error as a contributory factor in the crash.  In sum, the memo is a hearsay statement of a lay witness, without sufficient indicia of reliability, and thus its exclusion was neither improper nor unduly prejudicial to Plaintiffs' case.[39]

---

[37]In compliance with Judge Moody's *in limine* order, Defendant redacted the CIB report, which was introduced early at trial without objection as Defendant's Exhibit 42.  At the conclusion of the trial, Plaintiffs asserted for the first time that the exhibit had not been properly redacted.  The Court found no basis to support this claim and that Plaintiffs had waived this objection.  Furthermore, since Plaintiffs avoided any reference to the CIB in their closing, Plaintiffs have shown no prejudice to their case.

[38]Although Gen. Harrison was the convening authority, he was not a member of the board and took no part in its investigation of the crash.  Nor was he otherwise qualified to state these opinions. Accordingly, his testimony was also properly excluded.

[39]Although the Plaintiffs want to include his memo as part of the report, this is a matter of semantics.  Gen. Harrison recognized that his opinions were not truly part of the report; he titled his memo "Convening Authority Comments on the Collateral Investigation Report."  (Doc. 213 in 8:03-cv-539 at 14).  As such, his comments did not possess the indicia of trustworthiness that make investigatory findings of fact admissible when contained in public records and reports.  *See* F.R.E. 803(8)(C).  Moreover, to the extent that his opinions about the causes of the crash were properly part of the report, 10 U.S.C. § 2254(d) would render them inadmissible.

*(ii)*     *The Army Safety Board Report.*

The Court also excluded the Army Safety Board Report dated March 3, 2001.[40]  (Doc. 46).

The report, which is substantially redacted, was transmitted by a cover letter which notes that

"U.S. Army accident reports are closely protected and controlled" and "certain portions of the

safety report are exempt from mandatory release".  It further notes that these materials are for

safety purposes only, and are exempt from disclosure "so that individuals involved may freely and

openly provide uninhibited opinions and recommendations."  Each page of the report is stamped

"Limited Use Safety Investigation Report."  Accordingly, the report suffers from obvious

authenticity problems (portions are redacted) and it is hearsay.  The cover letter indicates a lack of

trustworthiness which obviates the public report exception under Federal Rule of Evidence 803(8).

Also, the report contains a substantial amount of information which is irrelevant to Plaintiffs' case

or otherwise cumulative of that portion of the CIB report which was admitted into evidence.[41]

---

[40]Apparently conceding that Mr. Malley's testimony lacked foundational support without the Army Safety Board Report, Plaintiffs now complain that exclusion of that report precluded them from supporting Mr. Malley's opinion testimony.  However, there is no evidence in this record that Mr. Malley had even read, much less relied upon, the Army Safety Board Report.  In fact, Mr. Malley made no reference to the Army Safety Board Report on his list of supporting documents in his expert report, in his deposition testimony, or at trial.

[41]Plaintiffs never specified that portion of this extensive report which they claimed was relevant to any issue in the case.

*(iii) Exclusion of Kevin Darcy's Testimony.*

At the outset of this case, a dispute arose as to the proper scope of expert testimony.[42]

Following lengthy argument, the Court ruled that an expert's opinion would be limited to that

which had been disclosed in his report, or as reasonably supplemented prior to that expert's

deposition.[43]   There was nothing in Mr. Darcy's Rule 26 report which would have put Defendants

on notice that he would express opinions as to the weight and balance of this aircraft on takeoff

and climb out.   His report was not supplemented, and Plaintiffs did not advise Defendants before

or during Mr. Darcy's deposition concerning these additional opinions.   In addition, the opinion

itself was never demonstrated to be reliable under a *Daubert* analysis.   The exclusion of Mr.

Darcy's testimony was therefore proper.

*(iv)    Defendants' Opening Statement.*

During opening, defense counsel mentioned the CIB report and alluded to the board's

conclusion.   Plaintiffs objected and asked for a curative instruction.   The Court declined to do so at

---

[42]This issue was euphemistically referred to as "expert creep;" i.e., the expansion of an expert's opinion after his Federal Rule of Civil Procedure 26 ("Rule 26") report had been served.   A variation on this issue was "expert switch," where one expert tried to assume the opinions of an expert who had been excluded.

[43]The underlying theme of the Court's ruling, which was consistently applied, was that a party should not be sandbagged by expert testimony that had not been subject to reasonable scrutiny during the discovery process.   Accordingly, Plaintiffs' argument concerning Mr. Morin's testimony (Doc. 133 at 8) is misplaced.   Mr. Morin's opinions were limited to those which had been disclosed to Plaintiffs prior to Mr. Morin's deposition, or consistent with genuine rebuttal.   Plaintiffs were also allowed to present expert rebuttal testimony at trial.

that time[44] but indicated it would consider a jury charge which dealt with the issue.  At the charge conference, both parties submitted proposed charges and (as was typical) neither would initially agree with the other.  Ultimately, Plaintiffs agreed to the charge proposed by Defendant, which was given without objection.  The charge was proper, Plaintiffs were not prejudiced and have otherwise waived any defect in Defendants' opening statement.[45]

> (v)     *Service Difficulty Reports.*

Prior to trial, Judge Moody ruled in limine that Plaintiffs could not introduce into evidence service difficulty reports ("SDRs") reflecting earlier problems with the APS-65 servo mount. Plaintiffs thereafter filed a Motion for Reconsideration of that ruling, (Doc. 269 in 8:03-cv-539), which this Court denied.  (Doc. 291 in 8:03-cv-539).  The Court has reviewed the record and believes these rulings were correct for the reasons previously given.[46]

> (vi)    *Sgt. Rikard's Deposition Testimony.*

Sgt. Rikard was not available to testify at trial and was not within the Court's subpoena power.  Defendant was thus allowed, pursuant to Rule 32, to use Sgt. Rikard's deposition

---

[44]The Court had just told the jury that the lawyers' statements were not evidence, and the Court repeated this instruction several times during the trial.

[45]Moreover, counsel's indirect reference in opening to the CIB's conclusion was a *de minimis* defect at best and would not warrant a new trial even absent the curative instruction.

[46]Moreover, Plaintiffs never complied with Judge Moody's requirement that they identify which SDRs they considered relevant in the context of "substantial similarity," and Plaintiffs made no effort during trial to do so.

testimony at trial.[47]  Plaintiffs' objections to his deposition were properly overruled, as Plaintiffs made no effort to state <u>any</u> specific objections.  Rather, Plaintiffs made a blanket objection, containing virtually <u>all</u> conceivable grounds, to <u>every</u> question.  This tactic was properly rejected by the Court.  Any objections Plaintiffs had to this testimony was waived as a result of their failure to register specific objects thereto.

### B.    Autopilot Issues

### (1)    The Rockwell Instructions

At the conclusion of Plaintiffs' case in chief, the Court granted Rockwell's Motion for Judgment as a Matter of Law, because there was no evidence that would support Plaintiffs' claim that the autopilot itself was defective. (T. at 2234).   Indeed, Plaintiffs' claim of negligence against BSC was predicated on the fact that Rockwell shipped the autopilot to Shorts with the retaining clip properly assembled.[48]  Plaintiffs do not attack this ruling itself, but rather the manner in which the Court explained it to the jury.

When the jury returned after the hearing on Rockwell's Rule 50 Motion, the Court informed them that "as a result of motions filed by the defendants, and having spent much of the weekend myself with my clerks working on this, the Court has concluded that under Rule 50, that judgment as a matter of law should be entered with respect to the defendant Rockwell."  (T. at

---

[47]In its pretrial submission (Doc. 216-5 in 8:03-cv-539), Defendants had designated Sgt. Rikard's deposition as a source of possible testimony.  Plaintiffs were therefore on notice of this possibility.

[48]Except for the absence of a warning annunciator discussed *infra*, Plaintiffs made no claim that the APS-65 was defective.

2237).  The Court then read the pertinent provision of Rule 50 to the jury and concluded by saying, "I have concluded based on the evidence presented by the plaintiff, that under controlling law there's no basis for a reasonable jury to conclude that Rockwell would be liable."  (T. at 2238).

Sometime later, Plaintiffs objected to this instruction and moved for a mistrial (T. at 2389), contending that the instruction implied that Plaintiffs had filed a frivolous lawsuit against Rockwell.  Of course, no such inference can be drawn from the instruction, and, when the jury subsequently asked about the reason for the ruling, the Court simply explained that there were certain matters that the Court must decide and that the dismissal of Rockwell was one of them.  (T. at 2402).  There was nothing improper about this instruction.  The jury was told only that a Rule 50 motion had been granted and that it was a matter for the Court to decide.  The jury was entitled to some explanation and they were told the truth.  Any other explanation or elaboration would have been problematic and potentially prejudicial to the remaining parties.[49]

During argument on the Rule 50 motions, the Court noted (outside the presence of the jury) that Rockwell shipped the servo mount to Shorts with proper assembly instructions.  (T. at 2234).  At the conclusion of the trial, Plaintiffs requested the following jury instruction: "I now instruct you that Rockwell Collins provided the subject servo mount to the other Defendants with proper assembly instructions."  The Court declined to give this instruction, because it would improperly comment on the evidence.  Plaintiffs claim that it was error for the Court to refuse this instruction. However, Plaintiffs were free to argue their case in closing and comment on the evidence as they saw fit.  The refusal to give this instruction was not error.

---

[49]The "curative" instruction proposed by Plaintiffs was clearly inappropriate.

*(3)     The Warning Annunciator*

The autopilot contains a feature which, under certain circumstances, limits the amount of torque which can be applied to the controls.  This feature, known as torque limiting, is necessary to prevent damage to the aircraft.  Plaintiffs allege that it is a design defect for the autopilot not to have a warning annunciator when the autopilot is in the torque-limiting mode, and Plaintiffs complain about the Court's exclusion of Wayne Smith's testimony in this regard.[50]

This issue was raised before trial by motion in limine.  By Order dated May 31, 2005, Judge Moody ruled that Plaintiffs' expert opinion regarding this defect would be excluded "unless Plaintiffs can identify prior to trial the [federal] regulation that requires an annunciator."  (Doc. 293 in 8:03-cv-539 at 2).  No such regulation was provided prior to trial.  Nor could Plaintiffs' counsel point to such a regulation during trial.[51]  Thus, the exclusion of Mr. Smith's testimony in this regard was consistent with Judge Moody's ruling and otherwise proper.

*(4)     Mr. Malley's Testimony*

At trial, after conducting a *Daubert* hearing, the Court excluded the testimony of Plaintiffs' expert, John Malley.  Plaintiffs claim that Mr. Malley was prepared to testify that "the autopilot was never properly tested in all areas of the C-23B+'s flight envelope and that this caused the

---

[50]Plaintiffs theorize that such a warning would have given the pilot critical advance notice of the problem and they speculate that such notice would have allowed him to control the airplane. However, torque limiting is a normal feature of the autopilot and would not have reasonably warned the pilot that the plane was about to become uncontrollable.  Moreover, the time which elapsed between the onset of torque limiting and the pilot taking control was less than two seconds.

[51]The plain language of the FARs relied upon by Plaintiffs do not support this proposition. *See* Doc. 40 in 8:03-cv-539.

crash." (Doc. 115 at 1-2).[52]  Mr. Malley had never before offered such an opinion on causation and could only speculate about what the "omitted testing" might have shown, what adjustments would have been made to the autopilot's programming, or how any such change would have affected the outcome of this incident, if at all.  Indeed, Mr. Malley's hypothesis suffered from the same fatal flaws as Mr. Bowman's "binding clip-jamming cable" scenario; neither had factual support and neither had been tested under the scientific method.

Furthermore, Mr. Malley's opinion was predicated on the assumption that the plane was properly loaded within its cg envelope.  That assumption was belied by the evidence.  The CIB report found that the plane was loaded well aft of its cg limit, a condition which was exacerbated when Mr. Larsen went aft to use the lavatory.  The CIB finding is based on the assumption that 18 bags weighing 60 pounds each were loaded in or near the dog box located in the rear of the airplane.[53]  But, regardless of the weight of the bags, Mr. Malley's testimony lacked sufficient reliability to be admissible under *Daubert*.  Mr. Malley admitted that the oscillations he saw in the Flight Data Recorder traces could be attributed to either a mis-tuned autopilot or an improperly loaded aircraft.  He candidly admitted he could not tell which was the real cause.[54]  Because there

_____

[52]Contrary to Plaintiffs' bald assertion, this was not their "main theory of liability."

[53]Plaintiffs contest this number and use 40 pounds per bag.  But even at 40 pounds, the plane was aft of its cg limit at the time of the mishap, if one assumes that all the bags were loaded in the rear.  Plaintiffs' own weight and balance expert, Mr. Barland, confirmed this fact.  All of the evidence suggested that whatever the bags weighed, they were loaded in the rear of the aircraft.

[54]It defies common sense to presume this autopilot was not properly tuned, when a fleet of these airplanes have flown hundreds of missions, over thousands of hours, at various load conditions without complaint.  Moreover, the jury's rejection of Plaintiffs' jammed-cable theory strongly suggests that an out-of-balance airplane was the cause of the crash.  Autopilots, of course, are not expected to fly a plane which is loaded aft of its cg limit, and no testing would ever be performed in that condition.

was substantial evidence that the aircraft was operating outside the certified aft cg limits, and because Mr. Malley had conducted no tests on this autopilot, the Court correctly concluded that Mr. Malley's opinion lacked reliability and was not admissible under *Daubert*.

VI.    Conclusion

Plaintiffs' Motion for New Trial presents a potpourri of mostly insignificant complaints about the conduct of a lengthy and complex trial.  Reduced to its essence, however, the problem with Plaintiffs' case was its lack of substance, not procedural or evidentiary irregularities. Plaintiffs' binding clip-jamming cable hypothesis lacked basic scientific credibility, and their other notions are nothing short of red herrings.  The evidence overwhelmingly suggests that the plane was mis-loaded and was out of balance, aft of its cg limit.  Autopilots are not designed to fly out-of-balance airplanes, and out-of-balance airplanes are unstable and can become uncontrollable. There was ample evidence to support the jury's verdict.  That verdict was rendered after Plaintiffs had a full and fair opportunity to present their case, and there were no substantial or prejudicial errors in the admission of evidence or conduct of the trial.[55]

Accordingly, it is

**ORDERED** that Plaintiffs' Motion for New Trial (Doc. 115) is **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on November 16, 2005.

Copies furnished to:

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Counsel of Record
Unrepresented Party

---

[55]Any issues raised by Plaintiffs in their Motion for New Trial which have not been specifically addressed herein are rejected as not worthy of discussion.